IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TERRY MACKEY, an individual, and MUSTANG HELICOPTERS, L.L.C., a Utah Limited Liability Company, dba MACKEY AVIATION,<br><br>                 Plaintiffs,<br><br>vs.<br><br>LLOYD MARKS, an individual, and MUSTANG HELICOPTERS, L.L.C., a Louisiana Limited Liability Company, DOES 1-20 and CORPS 1-20,<br><br>                 Defendants. | **ORDER**<br>**and**<br>**MEMORANDUM DECISION**<br><br>Civil No. 2:14-CV-00093-TC |

Plaintiffs Terry Mackey and Utah limited liability company Mustang Helicopters LLC have filed a breach of contract claim against Defendants Lloyd Marks and Louisiana limited liability company Mustang Helicopters LLC. The Defendants have filed a motion to dismiss for lack of personal jurisdiction and improper venue, or, in the alternative, on the basis of *forum non conveniens*. Alternatively, they request that the court transfer this case to a federal district court in the State of Louisiana. For the reasons set forth below, the court DENIES the Defendants' motion.

### **BACKGROUND**

Plaintiff Terry Mackey, a Utah resident, owns the Utah limited liability company Mustang

1

Helicopters LLC (Mustang UT). Mr. Mackey works full-time as a corrections officer for the state of Utah while he maintains his aviation business on the side.

Defendant Lloyd Marks, a Louisiana resident, is the sole managing member of Louisiana limited liability company Mustang Helicopters LLC (Mustang LA). He has never been domiciled in Utah, does not travel to and from Utah regularly, and does not own real property in Utah. Likewise, Mustang LA does not own real property in Utah or have offices in Utah.

In 2012, Mr. Marks, on behalf of Mustang LA, contacted Mr. Mackey in Utah about purchasing the assets of Mustang UT. On November 5, 2012, Mustang UT entered into an Asset Purchase Agreement[1] (Agreement) with Mustang LA for the sale of, among other things, Mustang UT's FAA-issued Part 135 Air Carrier Certificate (135 Certificate) allowing the holder to fly helicopters.

The Agreement was executed, at the suggestion of Mr. Marks, to resolve financial differences between another of Mr. Marks' limited liability companies—Ranger Aviation—and Mustang UT. At the motion hearing, the Defendants said that Mustang UT had leased property from Ranger Aviation and was behind in lease payments. Mr. Marks proposed the Agreement to settle Mustang UT's debt to Ranger Aviation. (By the Defendants' own admission, the court would have personal jurisdiction over Ranger Aviation if it were a party to this lawsuit.[2]) And that is what the executed Agreement was meant to accomplish. Section 2.1(5) of the Agreement provides that "Debts owed by [Mustang UT] to [Mustang LA] or any affiliated entity of [Mustang LA] [i.e., Ranger Aviation LLC] . . . will be forgiven by [Mustang LA]." (Agreement § 2.1(5).)

---

[1]The Agreement is attached as an exhibit to the Defendants' Motion to Dismiss or Transfer Venue (Docket No. 8).

[2]See Defs.' Mot. to Dismiss or Transfer Venue at 7.

The purchase price was $200,000, with $40,000 due at closing, and payments of $20,000 to be made every three months until the full purchase amount was paid. Mustang LA was to send these payments to Mustang UT's Utah address (the payments that Mustang LA actually made to Mustang UT followed that procedure). The parties agreed that the closing of the transaction occurred in Louisiana and that Louisiana law would govern the Agreement.

The Agreement was signed by Mr. Mackey on behalf of Mustang UT and by Mr. Marks on behalf of Mustang LA. Mr. Marks also signed the Agreement as a personal guarantor. The Agreement's signature page contains the following language: "Guarantor, LLOYD MARKS, hereby personally guarantees payment and satisfaction of the consideration detailed in this Purchase Agreement should BUYER [Mustang LA] be unable to perfect payment." (Agreement at p. 10.) The parties signed and dated the Agreement in their respective states of residence.

Mr. Marks did not travel to Utah and Mr. Mackey did not travel to Louisiana for the sale or closing of the Agreement. But before the signing of the Agreement, a large amount of emails, phone calls, and text messages were traded between the parties.[3] This pattern continued after execution of the Agreement as the parties worked out the operations in Utah and transfer of assets. In addition, the Defendants, within twenty-four days of the effective date of the Agreement, fired the chief pilot and various Utah-based employees.[4]

---

[3] Plaintiffs estimate that there were hundreds of emails, calls, and text messages. See Pls.' Opp'n Mem. (Docket No. 11) at 20.

[4] See id. at 19. Defendants contest Plaintiffs' right to use this set of facts in their argument. The Defendants incorrectly contend that the Plaintiffs are only entitled to have their allegations within the Complaint, not those in their opposition brief, taken as true. "The plaintiff bears the burden of establishing personal jurisdiction, but where, as here, the issue is raised early on in litigation, based on pleadings (with attachments) and affidavits, that burden can be met by a prima facie showing." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir. 2011) (emphasis added). Plaintiffs provided an affidavit from Mr. Mackey that vouches for the allegations in Plaintiffs'

The centerpiece of the Agreement was the sale and transfer of the 135 Certificate. Mr. Marks requested that he be designated as the process agent for Mustang UT to deal with the relevant documentation from the FSDO in Salt Lake City. To allow Mustang LA to use the 135 Certificate, the Federal Aviation Administration (FAA) Flight Standards District Office (FSDO) in Salt Lake City needed to amend the certificate to allow flights in Louisiana. The FSDO of Salt Lake City transferred this amendment process to the FSDO of Louisiana which, for reasons not absolutely clear in the record, rejected the amendment process and sent the certificate back to Salt Lake City for processing at that location. Mustang LA sent two employees to Salt Lake City specifically to work with FSDO in amending and transferring the certificate.[5] The FSDO of Salt Lake City eventually downgraded the 135 Certificate (which allows an operator to employ and use more than five pilots and conduct complex operations) to a Single Pilot Operator certificate (which allows for an operator to employ and use only one pilot).[6]

On November 6, 2013, the Defendants notified the Plaintiffs that they would not continue to make payments under the Agreement.[7] At that point, the Defendants had paid $100,000 of the purchase price and owed an outstanding debt of $100,000.

Unable to resolve the dispute, the Plaintiffs filed suit in the Utah state court at the end of 2013. At the beginning of 2014, the Defendants removed the suit to the federal district court.

---

Opposition. Consequently, the court includes that information in its analysis.

[5] It is not clear from the record at what point in the transfer and amendment process the two Mustang LA employees were sent to Salt Lake City, but it is clear they went to Salt Lake City after execution of the Agreement.

[6] Both parties allege that the downgrade was the result of a lack of cooperation by the other party.

[7] It appears that the Defendants stopped payment based on what they are characterizing was a breach of the Agreement by the Plaintiffs.

4

Defendants have filed a motion to dismiss for lack of personal jurisdiction, improper venue, or, in the alternative, on the basis of *forum non conveniens*. The Defendants contend that the court does not have general or specific jurisdiction over them. They then contend that the District of Utah is an improper venue under 28 U.S.C. § 1391 and § 1406 because a "substantial part of the events or omissions giving rise to the claim," 28 U.S.C. § 1391(2), did not occur in Utah and so the matter should be dismissed altogether. In the alternative, they argue that, at a minimum, this court should transfer the case "in the interest of justice" to the United States District Court for the Lafayette Division of the Western District of Louisiana.[8] And, finally, they contend that under the common law doctrine of *forum non conveniens*, litigating this case in the District of Utah "would be unnecessarily vexatious to the Defendants and would force the Court to deal with the nettlesome issues of foreign law [i.e., the civil law of the State of Louisiana]." (Defs.' Mot. to Dismiss or Transfer Venue at 14.)

## ANALYSIS

I. **Personal Jurisdiction**

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show both that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process." Intercon, Inc. v. Bell Atlantic Internet

---

[8]Thirteen days after Mr. Marks and Mustang LA removed this case from state court in Utah to the court here, Mr. Marks and Mustang LA filed a very similar suit against Mr. Mackey and Mustang UT in the United States District Court for the Western District of Louisiana, Lafayette Division. On July 15, 2014 (after this court held a hearing on the motion now before it), the federal district court in Louisiana transferred that suit to this court based on its analysis under the first-to-file rule (Mr. Mackey and Mustang UT had filed a motion to dismiss, stay, or transfer venue in Louisiana). (See Notice of Transfer (Docket No. 20) Ex. 1 (Memorandum Ruling by the Louisiana federal court).)

5

Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000). The Tenth Circuit has noted that "[a]lthough plaintiff bears the burden of establishing personal jurisdiction over defendant, in the preliminary stages of litigation this burden is light." Id. (internal quotation marks and citation omitted).

There is no question that this court does not have general jurisdiction over either Mr. Marks or Mustang LA. But the court finds that it has specific jurisdiction over both of the Defendants.

In Utah, the court applies a three-part test to determine whether the court has specific jurisdiction under Utah's long-arm statute.[9] Using the three-part test, the court must determine (1) whether the defendant's conduct is described within parameters of the Utah long-arm statute; (2) whether a "nexus" exists between plaintiff's claims and the defendant's conduct; and (3) whether attainment of personal jurisdiction over the defendant satisfies the requirements of due process. Far West Capital, Inc. v. Towne, 46 F.3d 1071, 1074 (10th Cir. 1995).

The Utah Supreme Court has stated that it "frequently make[s] a due process analysis first because any set of circumstances that satisfies due process will also satisfy the long-arm statute." SII MegaDiamond, Inc. v. Amer. Superabrasives Corp., 969 P.2d 430, 433 (Utah 1998). The due process clause protects an individual from being subject to "the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)). A court may exercise personal jurisdiction over a nonresident defendant "only so long as there exist 'minimum contacts' between the defendant and the forum state." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980) (quoting Int'l Shoe, 326 U.S. at

---

[9]Utah Code Ann. § 78B-3-201.

316). If such contacts exist, the court must determine whether exercising jurisdiction over the defendant would "offend traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316 (internal citations omitted).

### A. Minimum Contacts

The minimum contacts necessary for specific personal jurisdiction under the due process clause are established if the defendant has "purposefully directed his activities at residents of the forum [state] and the litigation results from alleged injuries that arise out of or relate to those activities." Burger King, 471 U.S. at 472 (internal quotation marks and citations omitted). See also Rambo v. Am. S. Ins. Co., 839 F.2d 1415, 1419 (10th Cir. 1988) (stating the "proper focus for analyzing these contacts is whether they represent an effort by the defendant to purposefully avail[] itself of the privilege of conducting activities within the forum State.") (internal quotation marks and citation omitted). The Supreme Court, in determining minimum contacts, rejected the application of a rote mechanical analysis in favor of a realistic approach analyzing the entire relationship of the parties. Burger King, 471 U.S. at 479. Under this approach, a court must consider the "quantity and quality of [defendant's] contacts with Utah, including 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[.]" Soma Med. Int'l v. Standard Chartered Bank, 196 F.3d 1292, 1298 (10th Cir. 1999) (internal quotation marks and citations omitted). Due process is not violated when the defendant's minimum contacts create "'continuing relationships and obligations with citizens'" of the forum state. Burger King, 471 U.S. at 473 (quoting Travelers Health Ass'n. v. Virginia, 339 U.S. 643, 647 (1950)).

The analysis of whether the nonresident defendant purposefully availed itself of the forum "'turns upon whether the defendant's contacts are attributable to his own actions or solely to the

actions of the plaintiff . . . [and generally] requires . . . affirmative conduct by the defendant which allows or promotes the transaction of business within the forum state.'" Rambo, 839 F.2d at 1420 (quoting Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 840 (9th Cir. 1986)).

Here, given the course of the parties' business negotiations, the terms of the Agreement, and post-Agreement activities, the court concludes that the Defendants purposefully availed themselves of the benefits and protections of Utah. First, Mr. Marks, on behalf of Ranger Aviation, entered into a business agreement with Mustang UT. When the Ranger Aviation business arrangement began to fall apart financially, Mr. Marks reached out to Mr. Mackey in Utah and suggested the Asset Purchase Agreement as a medium through which Mustang LA and related entities (i.e., Ranger Aviation) would forgive all debts owed by Mustang UT in exchange for a transfer of the assets of Mustang UT to Mustang LA. When the Defendants ultimately signed the Agreement, they committed themselves to a multi-year relationship with Utah. Mustang LA agreed to buy a Utah business, to deliver payment to Utah for that business, to discharge a debt of that Utah business for conduct that was admittedly performed in Utah, and to work with Plaintiffs to amend and transfer the 135 Certificate. And Mr. Mackey personally guaranteed the Agreement.

Defendants entered into the Agreement knowing that they would have to work within Utah for some time to complete the transfer of the 135 Certificate. Mustang LA sent two employees to Utah to work with the FSDO in Salt Lake City. Mr. Marks, in order to further facilitate the transfer, even requested that he be made the process agent for Mustang UT. Defendants exchanged many phone calls, emails, and text messages with individuals in Utah. Payment for the Agreement was not only sent to Utah, but deposited in a Utah bank.

Defendants created continuing relationships and incurred obligations to citizens of the State of Utah, both of whom are entitled to the protection of Utah's laws. Mr. Marks and Mustang LA

were involved in the hiring and firing of various Utah-based workers, as well as day-to-day communications, both pre- and post-Agreement.

The facts, when viewed in their totality, indicate that Defendants purposefully established continuing contacts, as well as obligations, with Utah residents arising out of the subject of this litigation. By taking those steps, Defendants were on notice that any potential conflict between the parties arising from their business dealings might end up in front of a Utah court. "[P]arties who reach out beyond one state and create continuing obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities." Burger King, 471 U.S. at 478.

### B. Fair Play and Substantial Justice

Even if a defendant's actions satisfy the minimum contacts test, a court must also consider whether "the exercise of personal jurisdiction over defendant would offend traditional notions of 'fair play and substantial justice.'" Intercon, Inc. v. Bell Atl. Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000) (internal citations omitted). The Tenth Circuit has identified the following five factors to consider when determining whether notions of fair play and substantial justice will be offended by the exercise of personal jurisdiction:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

Pro Axess, Inc. v. Orlux Distribution, Inc., 428 F.3d 1270, 1279-80 (10th Cir. 2005) (internal quotation and citation omitted). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at

477.

Defendants have presented no persuasive evidence or argument to indicate that notions of fair play would be violated by allowing Plaintiffs to pursue their claims in Utah. Mr. Marks operated a business that he admits is subject to personal jurisdiction of this court. Defendants were actively involved with amending and transferring the 135 Certificate out of the FSDO office in Salt Lake City. The record indicates that most of the witnesses who may be called in this action are located in Utah. Accordingly, the court concludes that it has specific jurisdiction over Mr. Marks and Mustang LA.

## II. <u>Venue</u>

The Defendants contend that venue is improper. Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated," or, "if there is no district in which an action may otherwise be brought as provided in this section, <u>any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.</u>" 28 U.S.C. §§ 1391(b)(2), (b)(3) (emphasis added).

The parties make numerous arguments about whether "a substantial part of the events" occurred in Utah, but, frankly, the court's conclusion that it has personal jurisdiction over both of the Defendants is sufficient to establish venue. <u>Id.</u> § 1391(b)(3) (any court with personal jurisdiction over a party is also a proper venue).

## III. *Forum Non Conveniens*

The Defendants alternatively assert that this court should exercise its discretion and dismiss the case based on the *forum non conveniens* doctrine. Under 28 U.S.C. § 1404, the court has discretion to change venue "[f]or the convenience of parties and witnesses, [and] in the interest of

justice." 28 U.S.C. § 1404(a). Indeed, district courts have broad discretion in determining whether to grant motions to transfer venue. Chrysler Credit Corp v. Country Chrysler, Inc., 928 F.2d 1509, 1515 (10th Cir. 1991). "The party moving to transfer a case pursuant to § 1404(a) bears the burden of establishing that the existing forum is inconvenient." Id. Furthermore, the moving party must provide strong evidence of the inconvenience. Briesh v. Auto. Club of So. Cal., 40 F. Supp. 2d 1318, 1322 (D. Utah 1999) (citing Rivendell Forest Prods. Ltd. v. Canadian Pac. Ltd., 2 F.3d 990, 993 (10th Cir. 1993)). Allegations alone are not sufficient to satisfy the burden of proof. Id. The party seeking transfer must demonstrate that the competing equities weigh in favor of adjudicating the case in a transferee district. For the reasons set forth below, the Defendants have not met their burden.

Specifically, the Defendants argue that the court should exercise its discretion to transfer the case to a federal district court in Louisiana. They contend that:

> [t]his case ought not to proceed in the District of Utah for various reasons. Chief amongst them is the fact that the controlling law concerning interpretation of the Asset Purchase Agreement will be the law of Louisiana. (See [Agreement] at 11.7.) Louisiana is a civil law jurisdiction where the contractual rights and obligations between parties are often governed by the Louisiana Civil Code. Jurisprudence in Louisiana is markedly different as the state has not accepted portions of various Restatements and the Uniform Commercial Code. Even *stare decisis* is not inviolable in such a civil jurisdiction.

(Defs.' Mot. to Dismiss at 15.) Defendants cite to Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981), to support their position that Louisiana law is complex "foreign" law outside the expertise of this court. While the court in Piper Aircraft did transfer the case on the basis that foreign law applied, it was dealing with Scottish law, a far cry from the law of a state of the United States of America. As Plaintiffs point out, the elements of a breach of contract claim are essentially the same in Utah and Louisiana.

The Defendants also assert that:

> FAA regulations and policies relevant to flying near and off of the coast [of Louisiana] will likely become relevant. One of the biggest challenges for transferring the Part 135 Certificate to Louisiana was assembling the proper paperwork, flight manuals, and operational specifications to satisfy the FAA. The FSDO office of the FAA in Salt Lake City was unfamiliar with those processes and had the entire matter transferred to the FSDO in Baton Rouge, Louisiana[,] in an attempt to resolve issues. All parties to this case may need to reference FAA practices specific to coastal flying and experts about such matters are not easily found in Utah.

(Id. at 16.) Assuming such information will be relevant when determining whether Plaintiffs fulfilled their obligations under the Agreement to work with FAA officials to get the certificate transferred from Utah to Louisiana, the out-of-state location of an expert on the subject does not make this court an inconvenient forum. Experts are flown in from all over the country to testify in cases. Furthermore, the fact that FSDO employees in the Salt Lake City office are also potential witnesses (e.g., to discuss the role of the Plaintiffs in the process and the basis for problems they experienced with the transfer to Louisiana) diminishes the strength of Defendants' argument.

"[T]he plaintiff's choice of forum should rarely be disturbed." William A. Smith Contracting Co. v. Travelers Indem. Co., 467 F.2d 662, 664 (10th Cir. 1972). Transfer to the court in Louisiana would only shift the inconvenience to a small business and its owner, who works full-time at a relatively modest job. Such inconvenience would be much greater than any inconvenience to the Defendants. Plaintiffs note that Mr. Marks "is listed as Agent, Director, President, Manager and Member with no less than 23 affiliations involving at least 14 business entities[.]" (Pls.' Mem. Opp'n at 25.) Merely shifting the inconvenience from one party to another, which is what a transfer of this case would do, is not a justification for a transfer. Scheidt v. Klein, 956 F.2d 963, 966 (10th Cir. 1992).

Accordingly, the court declines to transfer the case to a federal district court in Louisiana.[10]

**ORDER**

For all the foregoing reasons, the Defendants' Motion to Dismiss or Transfer Venue (Docket No. 8) is DENIED.

SO ORDERED this 17th day of October, 2014.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
United States District Judge

---

[10] The court also notes that the decision of United States District Court for the District of Western Louisiana to transfer a highly similar (if not mirror-image) case to this court further solidifies this court's decision to keep the case.