IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TERRY MACKEY and MUSTANG HELICOPTERS, LLC, a Utah Limited Liability Company,<br><br>    Plaintiffs,<br><br>    vs.<br><br>LLOYD MARKS, MUSTANG HELICOPTERS, LLC, a Louisiana Limited Liability Company, DOES 1–20 and CORPORATIONS 1–20,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER** |
| LLOYD MARKS and MUSTANG HELICOPTERS, LLC, a Louisiana Limited Liability Company,<br><br>    Counterclaimants,<br><br>    vs.<br><br>TERRY MACKEY and MUSTANG HELICOPTERS, LLC, a Utah Limited Liability Company,<br><br>    Counterclaim-Defendants. | Case No. 2:14-CV-00093-TC |

This is basically a breach-of-contract case between two entities, both named Mustang Helicopters, LLC.  One was formed in Utah and the other in Louisiana. To avoid confusion, the court calls them "Mustang Utah" and "Mustang Louisiana."

Mustang Utah sold nearly all its assets to Mustang Louisiana under a contract titled "Asset Purchase Agreement."  Almost a year after entering into the contract, Mustang Louisiana claimed that Mustang Utah (1) never possessed the intellectual-property right to use the "Mustang Helicopter" name and (2) failed to help transfer its primary asset, a certificate issued by the Federal Aviation Administration (FAA).

In January 2014, Plaintiffs Mustang Utah and Terry Mackey, the principal of Mustang Utah, filed a lawsuit against Defendants Mustang Louisiana and Lloyd Marks, the principal of Mustang Louisiana, for breaching the Asset Purchase Agreement and breaching Mr. Marks' guaranty.  They also assert equity claims. Defendants removed the lawsuit to this court and counterclaimed for breach of contract and some equity claims.  Now Plaintiffs and Defendants move for summary judgment.

Plaintiffs ask the court to enter judgment in favor of their claims for breach of contract and breach of guaranty while denying Defendants' claims for breach of contract, unjust enrichment, and detrimental reliance.  (ECF No. 30.)  Defendants request  judgment on their claims and dismissal of Plaintiffs' breach of contract, breach of guaranty, unjust enrichment, detrimental reliance, and equitable promissory estoppel.  (ECF No. 29.)

For the reasons discussed below, the court DENIES both motions for summary judgment because there are genuine disputes about material facts that must be left for the jury.

## **BACKGROUND**

Mr. Mackey lives in Utah and Mr. Marks lives in Louisiana, and both are helicopter pilots who operated aviation companies.  In January 2012, Mr. Mackey's company, Mustang Utah, leased a helicopter from one of Mr. Marks' companies, Ranger Aviation Leasing, LLC (Ranger Aviation).  Soon after entering the lease, Mustang Utah fell into arears on its payments to Ranger Aviation.  Ranger Aviation worked with Mustang Utah and reformed the payment options, but still Mustang Utah failed to pay all it owed.

By the fall of 2012, Mr. Marks and Mr. Mackey began formulating the Asset Purchase Agreement in which Mustang Utah sold its assets to Mr. Marks' new company, Mustang Louisiana.  (Pls. Mot. Summ. J. Ex. 3, ECF No. 30-2 [hereinafter Asset Purchase Agreement].)  Mustang Utah and Mustang Louisiana executed the agreement on November 5, 2012, and Mr. Marks agreed to act as Mustang Louisiana's guarantor.  As part of the agreement, Mr. Marks, through Ranger Aviation, forgave the approximately $78,000 that Mustang Utah owed him on the lease agreement.  In addition, Mustang Louisiana agreed to pay Mustang Utah $200,000.  Mustang Louisiana paid $40,000 at the closing and then began making scheduled $20,000 payments on the first day of every third month. Mustang Louisiana made three quarterly payments on time.  By August 2013, Mustang Louisiana had paid $100,000.  But in November, Mustang Louisiana refused to make another payment.

Two events led up to Mustang Louisiana's decision.  First, Mustang Louisiana was told that it could no longer use the "Mustang Helicopters" mark, and second, Mustang Louisiana had difficulty transferring the FAA certificate from Mustang Utah.  The Court will discuss both events in greater detail.

## I.    The rights to the "Mustang Helicopter" mark

The first and primary asset that Mustang Utah sold to Mustang Louisiana under the agreement was an "Air Carrier Certificate," which was issued by the FAA.  (Asset Purchase Agreement, art. 1.1(a).)  The parties call this a "135 Certificate"; yet it is officially titled "Air Carrier Certificate."  (Pls. Mot. Summ. J. Ex. 4, ECF No. 30-2 [hereinafter 135 Certificate].)  It likely gets its common name because it is governed by part 135 of Title 14 of the Code of Federal Regulations. The parties agree that the certificate permits companies to taxi people in a helicopter.

Under the Asset Purchase Agreement, Mustang Louisiana received any rights that Mustang Utah owned for the use of the name "Mustang Helicopters." The most important place where the companies used the name was on the 135 Certificate.  Mustang Louisiana also intended to call its company "Mustang Helicopters."  It sent letters to potential customers under that name, it painted this name on a wall in its hanger, and it made company business cards with this name.

In August 2013, Mustang Louisiana received a letter from an attorney representing Maverick Aviation Group, LLC (Maverick), a company that claimed that it owned the exclusive rights to use the "Mustang Helicopters" mark.  (Defs.

5

Mot. Summ. J. Ex. 6, ECF No. 29-7 [hereinafter Maverick Letter I].)  Maverick

requested that Mustang Louisiana stop using the mark.  Mr. Marks "sat on this

letter" for over two-and-a-half months before notifying Mustang Utah about the

issue.  (Pls. Mot. Summ. J. 7; Defs. Mem. Opp'n  5.)

On November 6, 2013, five days after Mustang Louisiana's payment was

due, it sent Mustang Utah a letter that claimed that because of Maverick's demand,

Mustang Utah had breached the Asset Purchase Agreement.  (Defs. Mot. Summ. J.

Ex. 8, ECF No. 29-9.)  Mustang Louisiana also demanded that Mustang Utah

indemnify it and "cure the Material Adverse Effect[1] within thirty (30) days."  (Id.)

Nineteen days later, on November 25, Defendants and Plaintiffs responded

to Maverick in a letter claiming that they had a right to use "Mustang Helicopters."

(Pls. Mot. Summ. J. Ex. 9.)  On December 20, 2013, Maverick's attorney replied to

the joint letter and responded to some of the legal arguments made by the

Defendants and Plaintiffs.  (Pls. Mot. Summ. J. Ex. 10 [hereinafter Maverick

---

[1] Article 4.2 of the Asset Purchase Agreement defines "Material Adverse Effect,"
which is discussed below.

Letter II].)  Maverick suggested that Mustang Louisiana could use a DBA[2] instead of "Mustang Helicopters."  (Id. at 2.)

After Maverick's second letter, Defendants claimed that they have no right to do any more business as "Mustang Helicopters."  Defendants maintain that they "had no option but to cease and desist all activities toward establishing Mustang Helicopters, LLC in Louisiana."  (Defs. Mot. Summ. J. 20.)  Plaintiffs argue that Mustang Louisiana could do business as a DBA, but Mr. Marks says that is something he does not want to do.

## II.    The difficulty in transferring the 135 Certificate

Mustang Utah, as the original holder of the certificate, agreed to work with the FAA to transfer its ownership to Mustang Louisiana.  Technically, the certificate is non-transferable; yet the parties believed that if the names of the companies were the same and all Mustang Utah's assets were conveyed to Mustang Louisiana, then the FAA would allow the transfer.  The parties agree that the process would be difficult, and it likely could take over a year.  During the

_____

[2] "DBA" is an acronym for "doing business as" which means operating a business under a trade name rather than the entity's legal name.

7

process, Mustang Louisiana could still enjoy the benefits of the certificate and operate its taxi business while the transfer happened.

Mustang Louisiana hired Mason Bundschuh as a consultant to assist with the transfer.  Mr. Mackey had worked with Mr. Bundschuh in the past and recommended him to Mr. Marks.  Mr. Bundschuh and Mr. Marks began the process of the transfer, but Mr. Marks' new business model complicated matters. Mustang Louisiana wanted to be able to fly over water so that its helicopters could fly offshore.  In Mr. Marks' deposition, he said how he wanted to service oil-and-gas drilling rigs in the Gulf of Mexico.  (Defs. Mem. Opp'n Ex. 4, at 121:6–17, ECF No. 31-2 [hereinafter Marks Dep.].)  Mr. Bundschuh had no experience with the overwater requirements and neither had the Flight Standards District Office (FSDO)[3] in Salt Lake City with whom Mr. Bundschuh was working to make the transfer.

Along with this obstacle, Mustang Louisiana had no chief pilot.  When Mustang Louisiana agreed to purchase Mustang Utah's assets, Rob Sims was its

---

[3] FSDO is part of the FAA.

Chief Pilot.  But two weeks after executing the Asset Purchase Agreement,

Mustang Louisiana fired Mr. Sims and had not hired a replacement.

According to a September 3, 2013 letter from the FAA to Mr. Mackey, any

entity holding a 135 Certificate must designate a chief pilot.  (Pls. Mot. Summ. J.

Ex. 12, ECF No. 30-2 [hereinafter FAA Letter].)  In the letter, the FAA recognized

that Mustang Louisiana "does not currently have a qualified Chief Pilot . . . ."  (Id.)

The FAA announced that the 135 Certificate had been downgraded to a "Single

Pilot Operator" because of the lack of a "qualified Chief Pilot."  (Id.)

Although the letter was a setback for Mustang Louisiana, it contained some

optimistic news.  The FAA reassigned the Baton Rouge branch of the FSDO to

oversee the certificate.  The Baton Rouge office was more experienced with

overwater certification, and it would conduct a Chief Pilot check on September 19,

2013, and a "mini-certification to upgrade Mustang Helicopters to a full Part 135

operator."  (Id.)  The FAA said that once it received a specific signed document,

Mustang Louisiana's "OpSPECS," it would proceed with the transfer and

"Mustang Helicopters may again be upgraded to a full Part 135 operator."  (Id.)

It is unclear whether Mustang Louisiana ever submitted OpSPECS or

participated in the September 19 pilot check or the mini-certification.  On

November 18, 2013, FSDO in Baton Rouge requested a meeting with "company

officials."  (Pls.' Mem. Opp'n Ex. 14, ECF No. 32-3.)  The letter was sent to

Mr. Marks and Mr. Mackey.  (Id.)  There is no evidence that Mustang Louisiana or

Mr. Marks responded or attended this meeting.  On April 1, 2014, Mr. Marks

notified FSDO, by letter, that he "no longer require[d] a certificate transfer."  (Id.

Ex. 15.)  The letter read, "A number of circumstances that have occurred have

prohibited the clear transfer of this certificate, therefore we are requesting the

certificate to be returned to Terry Mackey . . . ." (Id.)

## DISCUSSION

### I.    Legal Standard

A court must grant summary judgment when the moving party "shows that

there is no genuine dispute as to any material fact" and that the party "is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment will not

be granted "if the dispute about a material fact is 'genuine,' that is, when the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When

considering a motion for summary judgment, a court should not "weigh the

evidence and determine the truth of the matter but . . . determine whether there is a genuine issue for trial." Id. at 249.

When a court receives two cross-motions for summary judgment, the court treats each separately; "the denial of one does not require the grant of another." Buell Cabinet Co., Inc. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979), quoted with approval in Christy v. Travelers Indem. Co., 810 F.3d 1220, 1225 n.3 (10th Cir. 2016). And when the court considers cross-motions for summary judgment, the court may "assume that no evidence needs to be considered other than that filed by the parties . . . ." Atl. Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000).

## II.      Choice of law

Here the court's subject-matter jurisdiction is based on the diversity of the parties and 28 U.S.C. § 1332. The parties agree that Louisiana law governs the substantive issues in this lawsuit. When exercising diversity jurisdiction, the court must "follow the most recent decisions of the . . . highest court" for the chosen jurisdiction. Wade v. EMCASCO Ins. Co., 483 F.3d 657, 665–66 (10th Cir. 2007). If the court cannot predict what the highest court would do by looking at lower

court decisions, the court's "task is to predict what the state supreme court would do." Id. at 666.

The Fifth Circuit, while sitting in diversity jurisdiction and applying Louisiana law, held that when a court is trying to predict what the Louisiana Supreme Court would decide, the federal court must "employ the appropriate Louisiana civilian methodology to decide th[e] issue[s]." Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co., 352 F.3d 254, 260 (5th Cir. 2003) (alterations in original). The Fifth Circuit continued,

> [u]nder Louisiana's Civil Code, the only authoritative "sources of law are legislation and custom." Thus, in Louisiana, courts must look first and foremost to the state's "primary sources of law: the State's Constitution, codes, and statutes." As we have previously recognized, "the primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts.'" Indeed, "[s]tare decisis is foreign to the Civil Law, including Louisiana." . . . . Therefore, while it is true that we will not disregard Louisiana appellate court decisions unless we are convinced "by other persuasive data that the highest court of the state would decide otherwise," "particularly [if] numerous decisions are in accord on a given issue—the so-called jurisprudence constante—we are not strictly bound by them."

12

Id. at 260–61 (citations omitted).

## III.    Breach of contract

Under Louisiana law, the elements of breach of contract are: (1) the

obligor's undertaking an obligation to perform, (2) the obligor failed to perform the

obligation (the breach), and (3) the failure to perform resulted in damages to the

obligee.  Lamar Contractors, Inc. v. Kacco, Inc., 174 So. 3d 82, 87 (La. Ct. App.

2015), aff'd in part, vacated in part on other grounds, 189 So. 3d 394 (La. 2016).

When one party's material performance is delayed or withheld, the other party

"may decline to perform [its obligation] because the . . . breach has made his

performance precarious."  Leto v. Cypress Builders, Inc., 428 So. 2d 819, 822 (La.

Ct. App. 1982); Fullerton v. Scarecrow Club, Inc., 440 So. 2d 945, 949 (La. Ct.

App. 1983).  If a party's failure to perform is justified by a valid excuse, then it is

relieved from damages.  La. Civ. Code Ann. art. 2008 (West, Westlaw through

2016 Reg. Sess.); 6 Saúl Litvinoff, Louisiana Civil Law Treatise: Law of

Obligations § 13.15 (2d ed. 2001).  Whether a party properly performed its

obligation is a question of fact.  Imperial Chemicals Ltd. v. PKB Scania (USA),

Inc., 929 So. 2d 84, 93 (La. Ct. App. 2006).

Additionally "[a]n obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform.  When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced." La. Civ. Code Ann. art. 2002.

Here, Plaintiffs argue that Mustang Louisiana breached the Asset Purchase Agreement by failing to make its scheduled $20,000 payment on November 1, 2013.  Article 2.1 of the Asset Purchase Agreement reads,

> (2) . . . a payment of $20,000 will be due every three months on the first day of the month . . . . (3) An interest rate of 6% shall be allocated to the scheduled payment if said payment is paid after 15 days from the first of the designated month.

Defendants maintain that they were excused from making any payment because Mustang Utah breached the agreement by failing to convey the right to use "Mustang Helicopters," and not assisting with the transfer of the 135 Certificate.

### A.     The right to use "Mustang Helicopters"

Defendants base their breach-of-contract claim on multiple articles within the agreement.  First, Mustang Louisiana's obligations were conditioned.  Article VII reads,

14

> The obligations of [Mustang Louisiana] to purchase the Assets . . . shall be subject to the satisfaction . . . of all of the following conditions . . . :
>
> **7.1**   All of the representations and warranties of [Mustang Utah] . . . shall have been true and correct *in all material respects* . . . .

(Emphasis added).  Article IV of the agreement lists Mustang Utah's representations and warranties.  Article 4.2 reads,

> [Mustang Utah] holds all . . .  trademarks, trade names, . . . and copyrights owned or held by [Mustang Utah], the absence . . . of which could reasonably be expected to have a material adverse effect on the Assets or [Mustang Utah,] and, since December 1, 2010, there has been no event or condition . . . that . . . can be reasonably anticipated to have a material adverse effect on the financial, . . . or legal condition of the Assets or [Mustang Utah] (collectively, a "Material Adverse Effect").

Article I of the agreement defined what assets were included in the sale.  It reads, in part,

> **1.1**    . . . [Mustang Utah] agrees to sell, . . .  transfer, . . . and deliver to [Mustang Louisiana] . . . the following assets and properties (hereinafter "Assets"), free and clear of . . . all . . . adverse claims, rights, restrictions, burdens and encumbrances . . . ("Encumbrances"), to wit:

15

> (a) The [135 Certificate], and any intellectual property
> and/or other trademark-related rights, including, but not
> limited to, all trade names, service marks (registered or
> unregistered), trademarks (registered or unregistered),
> copyrights, reports, logs, documents, logos . . . in
> connection therewith, owned and/or used by [Mustang
> Utah] in connection with [Mustang Utah] and as it relates
> to the 135 Certificate.

In sum, for Mustang Louisiana to prove Mustang Utah breached the contract,

Mustang Louisiana must show Mustang Utah's warranties were not true in some

"material respect[]" and the lack of the intellectual-property right would

"reasonably be expected to have a material adverse effect" on the 135 Certificate,

the primary asset sold under the agreement.  (Id. arts. 7.1 and 4.2.)

Defendants claim that they could not use "Mustang Helicopters" at all

because of Maverick's letters.  The first letter to Mustang Louisiana said that

Maverick discovered "that you [Mustang Louisiana] advertise and/or provide

services using the MUSTANG HELICOPTERS mark."  (Maverick Letter I, at 1,

ECF No. 313.)  In the letter's next paragraph, Maverick demanded that Mustang

Louisiana discontinue its "advertisement and use of the" mark.  Maverick also said

it would give Mustang Louisiana thirty days to discontinue "all use of" the mark.

Early in the letter, it seems that Mustang Louisiana could keep using the "Mustang

16

Helicopters" mark for limited purposes, but later Maverick's demand seemed to be a categorical prohibition.

Maverick's second letter on December 20, 2013 said that Mustang Louisiana was "free to keep the business entity . . . 'Mustang Helicopters, LLC' so long as they operate and advertise under a non-infringing DBA." (Maverick Letter II, at 2.) Later the letter demanded that Mustang Louisiana discontinue only its "infringing" use rather than all uses.  (Id.)  In addition to this, Maverick did not contend that Mustang Louisiana could not use "Mustang Helicopters" on the 135 Certificate. (Pls. Mot. Summ. J. 8; Defs. Mem. Opp'n 6.)

Using a DBA might have avoided those adverse effects that were material. A reasonable jury could find that Mustang Louisiana should use a DBA for its business activities to avoid the intellectual-property claim from Maverick.

But, even if Mustang Louisiana had used a DBA, a question remains whether the FAA allows a certificate holder to use a DBA.  There is some evidence that the FAA would.  Defendants argue that Mustang Utah, who operated under the 135 Certificate, used the DBA "Mackey Aviation" before entering in to the Asset Purchase Agreement.  (Defs.' Reply Mem. 36, ECF No. 36 ("Mr. Mackey went on to testify in [a] deposition that . . . it would have been easy to operate under a

17

DBA.")  Also, Maverick's second letter claims that the FAA allowed Maverick to use the "Mustang Helicopters" mark "as a 'DBA.'"  (Maverick Letter II, at 1.) There is no evidence showing that the FAA prohibits operators from using DBAs.

Mr. Marks maintained that he was unwilling, in any event, to use a DBA. (Marks Aff. para. 11, ECF No. 312.)  He said that he had "no interest in operating any business I own as a [DBA]."  (Id.)  Here is a deposition excerpt explaining why he refuses to use a DBA:

> Q.   So, Mr. Marks, what, if anything, pre[c]luded Mustang Louisiana from using a d/b/a in connection with the 135 Air Carrier Certificate?
>
> A.   That's fine if you're in agreement of before you do something to say, [w]ell, maybe, you know, if everything goes bad, I'll use a d/b/a.  I'm not.  I don't believe that you should buy something, put it on the shelf, and do a d/b/a—it's something else— when someone threatens to sue you and file legal action against you if you use the name.  I bought the name and the company.
>
> Q.   But you know corporations use d/b/a's all the time. Why do you have such a disdain for the use of a d/b/a?
>
> A.   I'm not in the business of doing a d/b/a.  Just I'm not.  I've never used it before on any company I have, past, present, or future that I plan on doing. I don't see the need to do that.

18

(Marks Dep. 169, ECF No 312.)  Mr. Marks' opinion alone is not determinative

because article 4.2 of the Asset Purchase Agreement adopted an objective

reasonableness standard.  It is up to the jury to decide whether the adverse effects

resulting from not being able to use "Mustang Helicopters" are material.

If Mustang Louisiana were to use a DBA, then it would need to relaunch its

marketing efforts by sending out new letters, repainting its wall, and purchasing

new business cards.  Whether those costs were material is a question for a

factfinder.  Sufficient evidence exists for the jury to return a verdict in favor of the

Plaintiffs' or the Defendants on this issue.

### B.  Failure to assist transferring the 135 Certificate

In addition to the intellectual-property issue, Defendants maintain that

Mustang Utah did not help transfer the certificate.  Article 2.2 of the Asset

Purchase Agreement reads:

> [Mustang Utah] shall assist [Mustang Louisiana] in the
> transfer and perfection of the 135 Certificate.  Upon
> perfection of transfer of the 135 Certificate, and after the
> FAA maintains approval of the transfer, and upon
> payment of the consideration, at the appropriate time
> designated by [Mustang Louisiana], [Mustang Utah] shall
> remove its name and/or Terry Mackey's name from the
> 135 Certificate and shall dissolve its entity.  The

19

> aforementioned shall be completed within (30) days from
> notice by [Mustang Louisiana] to [Mustang Utah].

Mustang Utah had a duty to assist with the transfer, and at the same time, Mustang

Utah had a right to keep its name on the 135 Certificate until the Mustang

Louisiana paid the full $200,000.

Because Mustang Utah was the named operator, it was the agent of record

with the FAA, and Mr. Mackey received communication from the FAA and FSDO

about the certificate.  Mustang Louisiana contends that because Mr. Mackey

remained FAA's sole point of contact there was delay in the transfer process.

Mr. Mackey worked as a correctional officer at a facility where he could not

communicate from 6:00 in the morning to 6:00 at night.  He could talk only by

telephone after regular business hours.  But the Defendants do not identify a

specific FAA communication that Mr. Mackey failed to convey timely.  They

make general complaints: "[c]ommunication with Mr. Mackey during the transfer

process was challenging at best . . ." or "Mr. Mackey did not communicate with

Defendants or their associates to keep all parties abreast of the progress being

made at the Salt Lake City FSDO."  (Defs. Mem. Opp'n 26; Defs. Mot. Summ.

J. 18, ECF No. 29.)

The Plaintiffs, in their reply memorandum, submit evidence showing that Mr. Mackey exchanged at least 144 emails with the Salt Lake City FSDO from July 5, 2011 and February 2014.  (Pls. Reply Mem. 4, 14, Exs. 3, 4, ECF Nos. 34, 34-4, 34-5.)   Yet, many of these emails occurred before the execution of the Asset Purchase Agreement and the descriptions are imprecise.

The general allegations from the Defendants and the vague email descriptions alone are not enough to rule that a reasonable jury would enter a verdict for or against either party.  Accordingly, summary judgement is not appropriate and the case must proceed to trial.

## IV.   Breach of guaranty and various equity claims

Under the laws of Louisiana, the personal suretyship is secondary to the principal obligation it secures.  When that obligation is extinguished, so too is the suretyship.  La. Civil Code art. 3059.  Because a jury must decide whether the Plaintiffs materially breached the Asset Purchase Agreement, which the guaranty contract secures, it is too soon to rule on the breach of guaranty.

Similarly, to recover in equity, a party must show there is "no other remedy at law available."  See, e.g., Baker v. Maclay Properties Co., 648 So. 2d 888, 896–97 (La. 1995) (discussing quantum meruit and unjust enrichment claims).

21

Until the legal dispute over the contract is resolved, the equitable claims must remain.

## **<u>ORDER</u>**

For these reasons, the court DENIES the Defendants' Motion for Summary Judgment (ECF No. 29) and the Plaintiffs' Motion for Summary Judgement (ECF No. 30).

DATED this 19th day of August, 2016.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge